POTTHOFF et al. v. HANSON & VAN WINKLE CO.

(Circuit Court of Appeals, Third Circuit. November 29, 1909.)

No. 7.

PATENTS (§ 328*)—ANTICIPATION—BATH AND PROCESS FOR COATING METALS.

The Alexander reissue patent, No. 11,624 (original No. 563,723), for an electrolytic bath for coating metals and process of coating metals galvanically, is void for anticipation by the Falk German patent, No. 47,457, of December 3, 1887; also, *held* not infringed if conceded validity.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the District of New Jersey.

Suit in equity by Lewis Potthoff and the United States Electro Galvanizing Company against the Hanson & Van Winkle Company. Decree for defendant, and complainants appeal. Affirmed.

For opinion below, see 163 Fed. 56.

C. V. Edwards, for appellants.

Harry E. Knight, for appellee.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the court below, dismissing the bill of complaint, which charged the defendant with infringement of claims 1 and 3 of complainants' reissue letters patent No. 11,624. The complainants claimed title by assignment from the patentee, and the defenses interposed by defendant were, denials of complainants' title, of the validity of the patent, and of infringement, and the averment that the term of the patent had expired by reason of the expiration of the term of certain foreign patents. The bill was dismissed by the court below, on the ground that the defendants had not infringed the claims of the patent in suit.

The patent in suit is, as stated, a reissue patent, dated August 3, 1897. The original patent was dated July 14, 1896. The first paragraph of the specification of this original patent is as follows:

"Be it known that I, Hans Alexander, Ph. D., a subject of the Emperor of Germany, residing at Berlin, Kingdom of Prussia, Germany, have invented certain new and useful improvements in coating metals with zinc, tin, tin and zinc, also with nickel and with copper, (for which patents were granted to me in Germany May 13, 1887, No. 45,220, December 3, 1887, No. 47,457, and December 28, 1888, No. 49,826, and in Austria-Hungary October 4, 1890, Nos. 5,125 and 39,520,) and of these improvements the following is a full, clear, and exact specification, disclosing the process and also the means and materials used therein."

In the reissue patent, this recital of the foreign patents in the first paragraph of the specifications in the original letters patent, is omitted, as being an error or mistake made by the patentee, as averred in his sworn application to the Patent Office for a reissue, under the authority of section 4916 of the Revised Statutes (U. S. Comp. St. 1901, p. 3393). Claims 1 and 3 of the reissue patent, the only ones in controversy, are identical with those claims in the original patent. They are as follows:

"1. An electrolytic bath for coating metals, composed of a solution of from five to eight parts of commercial chlorid of aluminium containing free acid in one hundred parts of water and of so much of reguline coating metal, as will dissolve therein, while the bath is heated to the boiling-point, and from two-tenths to three-tenths of a part of chlorid of the coating metal."

"3. The process of coating galvanically metals, subjected to rapid oxidation, with metallic alloys, containing a small percentage aluminium, consisting in subjecting the metals to the action of an electric current in an electrolytic bath, composed of a solution of five to eight parts of commercial chlorid of aluminium, dissolved in one hundred parts of water and of so much of reguline metal as will dissolve therein, with some organic acid added to the bath, and using an anode, made of the metal, forming the principal component of the coating alloy."

The first claim is for a product, and the third is for the process of production.

The learned judge of the court below considered only the defense of noninfringement, saying:

"As I regard the case, however, it will be unnecessary to consider any of the defenses just suggested, further than to say that after a careful reading

of the testimony relating to the prior art, it is demonstrated, in my judgment, that if the patent in suit can be upheld, it can only be by giving the claims involved a literal rendering, since they cannot be interpreted broadly without destroying all pretense to novelty or invention. The patent is in no sense basic. With the claims then interpreted narrowly, as they must be, the defendant has not infringed."

In view of the elaborate and well-reasoned opinion which then follows (163 Fed. 56), in which the conclusion is reached that the defendant has not infringed the claims in question, it is necessary to say little else than that we agree both with the reasoning and conclusion arrived at by the court below. We think the expert testimony on behalf of the defendant clearly demonstrates the correctness of the opinion in this regard. This testimony is quite voluminous, but its weight clearly supports the learned judge of the court below, in saying:

"If, therefore, any one thing is made clearer thereby" (i. e. by the specifications) "than another, it is that the invention is characterized by the use of basic salts held in solution, as elsewhere stated, by the organic acid," and that "the specification * * * makes it clear that the bath of the patent is necessarily basic and was so intended. * * * It is the patentee's main object and consistent effort to produce a bath which is basic,—containing basic salts. He boils metal in a solution of salt until no more metal will dissolve. If by reason of expense he is driven to using an acid containing salt, his first care is to neutralize that acid or bind it." (This is the free acid contained in the commercial chloride of aluminium, mentioned in the claims.) "Acid is, so to speak, a bete noir to the inventor, but defendant deliberately and designedly chooses acid,—precisely what the inventor most carefully avoids: and not only so, but defendant maintains the acid condition of his bath, by addition of acid directly from time to time. In fact, defendant's bath won't work unless acid. But the bath of the patent will not work unless it is basic, and the patentee maintains its basicity with an organic or equivalent substance."

Or, as Dr. Chandler, the defendant's expert, says:

"He [the defendant] does not make basic salts, but he carefully adds sulphuric acid to his bath and keeps it supplied with sulphuric acid from time to time to prevent the formation of basic salts. * * * The bath of claim 1 has been boiled with metallic zinc for the purpose of creating basic salts of aluminium and zinc, while defendant's bath has never been boiled at all, and does not contain any basic salts of aluminium or zinc."

Not only do we have the positive testimony of Dr. Chandler, defendant's expert and chemist of long and unusual experience in the chemistry of this particular art, that the composition and process of the claims of the patent in suit necessarily result in these basic salts, but we have the distinct avowal in the first specification of the patent, that the patentee's invention "consists of a process wherein basic salts of aluminium, or a basic salt of the metal to be used for the coating or plating, are used in the bath." Further on in the specifications, the patentee, in speaking of the "equally thick and well adhering coat" of zinc or tin, with which, by his process, he is enabled to cover iron and steel, says:

"This I obtain principally by using in the bath basic salts of aluminium, by saturating the solution to its utmost capacity with the coating metal and adding to it some organic substance."

This last element is the organic acid mentioned in the third or process claim, and, as explained in the specifications, is added merely

to prevent precipitation of the basic salts of aluminium, which it is said are dissolved with difficulty in water. Without dwelling upon the other reasons given by the court below for its conclusion that the defendant does not infringe, we think the difference between complainants' and defendant's composition and process, to which we have just adverted, is too clearly established to admit of successful denial. A careful reading of the testimony given by complainants' expert does not satisfy us that he has met the reasoned opinion of Dr. Chandler on this point, viz., that the bath of the patent in suit is necessarily, and of purpose, made a bath of basic salts of aluminium, and that "defendant does not use basic salts of any kind in the preparation of his bath, does not produce basic salts in the preparation of his bath, and adds free acid from time to time to prevent the formation of basic salts." The absence in defendant's composition of this essential element of claim 1 of the patent in suit, to wit, basic salts, refutes the charge of infringement.

We think, however, we should go further and consider the testimony, expert and otherwise, bearing upon the question of the validity of the patent. A careful reading of this testimony on both sides clearly shows that the composition and process of the patent in suit are anticipated by the foreign patents cited by the patentee in the specification of his original patent, notably by the so-called German "Falk" patent, No. 47,457, granted December 3, 1887. We do not think the testimony in support of this contention should be overlooked, inasmuch as in the original patent, of which the patent in suit is a reissue, it is distinctly declared that this "Falk" patent, together with certain other foreign patents, were for improvements in coating metals identical with the improvements set forth in the specifications and claims of the patent in suit. It is true, that the patentee, in his petition for the reissue, sets forth his recital of these foreign patents, as being for the same improvements for which he had asked a patent from the United States, as a mistake on his part, by reason of which mistake he claimed the right to a reissue. Nevertheless, we have the categorical statement in the original patent, as above quoted, from which we must necessarily understand that, at the time it was made, the patentee himself believed that the improvements for which he asked a United States patent were identical with those for which the foreign patent had been issued. For this change in the belief of the patentee, no reason is given in his petition for reissue, except that the petitioner had discovered that the said recital would render the patent inoperative or invalid, a motive sufficiently strong without impugning the good faith of the applicant or his solicitor to stimulate the discriminative faculty of both to discover a difference which had formerly escaped the attention of the patentee.

We are not surprised, therefore, in turning to this "Falk" patent, to find that its specification opens with the statement that the invention therein described "concerns the production of galvanic deposits which consist of zinc, or zinc and tin, or tin, or copper, or nickel in combination with aluminium," the general description of the coating set forth in the patent in suit.

As set forth in the defendant's brief, this German patent, after explaining the supposed objections of a theretofore known zinc and

aluminium-containing bath, and the objections to both acid and alkaline baths, says:

"The inventor has now found that this evil may be remedied, if, for the production of a good, strong, homogeneous zinc deposit, an aluminium chloride solution be saturated with metal, whereby, on the one hand, a solution, rich in zinc, results in a good neutralization, and on the other hand, by the use of such a bath, an aluminium-containing metal deposit is obtained, which is improved by this addition."

This may well be called by defendant, a paraphrase of the language in lines 29 to 37, page 1 of the patent in suit, which is as follows:

"I have found that in plating of iron and steel (and also of other metals) with zinc, the best results are obtained when the bath is prepared by saturating a (heated) solution of chlorid of aluminium with reguline zinc, whereby a plating is obtained containing a small percentage of aluminium, this addition of aluminium rendering the plating more compact, smooth, and durable."

Dr. Chandler, the defendant's expert, in his testimony compares this Falk patent with the patent in suit, as follows:

"A. German patent 47.457, granted to Richard Falk, dated December 4, 1887, and published May 22. 1889.

"It is entitled 'process for the galvanic precipitation of zinc, tin, copper, and nickel.'

"The inventor first states that this invention relates to the preparation of galvanic precipitates; that is, coatings, which consist of zinc, or zinc and tin, or tin, or copper, or nickel in combination with aluminium.

"He then states that processes previously in use for the galvanic precipitation of zinc have employed either an acid sulphate of zinc solution, or an alkaline solution, and further that a solution of zinc hydrate in alum has been employed. He points out the disadvantages of these various solutions and then proceeds to describe his own invention. He says he has found that these evils can all be avoided when one employs an aluminium chloride solution saturated with metal, by which on the one hand a solution rich in zinc and well neutralized is obtained and a metallic precipitate or coating is secured containing aluminium, strong and uniform in character. The inventor then proceeds to describe several baths which he says are suitable for the galvanic depositing of zinc containing aluminium with or without metallic tin.

"First bath: This bath consists of a solution of aluminium chloride saturated by boiling with metallic zinc to which there is subsequently added some chloride of zinc and a small quantity of chloride of tin.     *   *   *

"Third bath: In this bath the aluminium chloride is saturated with metallic magnesium or metallic aluminium instead of with zinc as in the first bath, or tin as in the second bath. There is subsequently added a quantity of chloride of zinc equal in weight to the chloride of aluminium employed, and also an amount of chloride of tin equal to five per cent. of the chloride of aluminium employed.

"For these above mentioned baths the inventor says that he employs advantageously an anode of metallic zinc or an anode composed of 1/3 zinc and 2/3 tin.   *   *   *

"The inventor states that the product of the first bath will consist of zinc containing aluminium or zinc containing aluminium and tin, while the deposit of the second and third baths will consist of zinc containing aluminium and tin, and the product of the fourth bath will consist of zinc containing aluminium.

"The inventor further states that for the production of a galvanic deposit of copper, tin, or nickel, in combination with aluminium, he employs a solution of chloride of aluminium saturated hot with metallic magnesium or aluminium, or a sulphate of aluminium solution saturated with metallic magnesium in connection with an anode of the corresponding metal, copper, tin or nickel, and he further states that the deposit which results is on account of the aluminium

which it contains; hard bronze-like copper, or hard tin, easily polished or ductile while nickel.

"The first claim of the patent is for the process for producing galvanic deposits of zinc, tin and zinc, tin, nickel, or copper, durable and uniform, by the use with either of these metals of a basic salt of aluminium, free from alkali so that one may obtain a metallic deposit containing aluminium.

"Second claim is for the preparation of the bath described in the first claim and consists in using a solution of an aluminium salt which has been saturated by the aid of the electric current with a metal, such as zinc, tin, magnesium, or aluminium, and the subsequent addition of a salt of the metal to be deposited, either sulphate, nitrate, or haloid salt (chloride), in order that the bath for carrying out the process of claim 1 shall consist of a solution of a basic salt of aluminium and a salt of the metal to be deposited and shall be free from alkali.

"Third claim is for the use in the solution described in claim 2 as a galvanic bath of an anode of the metal to be deposited.

"It thus appears that the alleged novelties described and claimed in this patent for the production of metallic deposits or coatings by electric currents, consisting of zinc, tin and zinc, tin, nickel or copper, alloyed with metallic aluminium, are

"1. The employment in the bath of a basic salt of aluminium, the chloride or sulphate.

"2. The preparation of this basic salt by boiling a solution of chloride or sulphate of aluminium with either of the following metals: Zinc, tin, magnesium, or aluminium with or without the aid of electricity.

"3. The addition to the bath of a salt of the metal to be deposited; either the sulphate, the nitrate, or a haloid salt (chloride).

"4. A bath free from alkali.

"5. The use of an anode of the metal to be deposited.

"On comparing the invention described and claimed in this German patent of Falk, 47,457, with the patent in suit, I find that it embodies nearly all the essential features of the patent in suit:

"1. It employs basic salts of aluminium, as the foundation of the bath, as does the patent in suit.

"2. In order to produce the basic salts of aluminium it employs chloride of aluminium and saturates the same with zinc or aluminium with or without the aid of electricity, all of which is described and set forth in the patent in suit. The German patent suggests the use of sulphate of alumina instead of the chloride, which the patent in suit does not, and also suggests the use of tin or magnesium in addition to the use of zinc or aluminium for saturating the bath, which the patent in suit does not.

"3. The German patent directs the addition to the bath of a salt of the metal to be deposited, and in some cases chloride of tin also, which are also characteristic features of the patent in suit.

"4. The German patent directs the use of an anode composed of the metal to be deposited as does the patent in suit.

"In all these respects the directions of the patent in suit are fully stated clearly and distinctly in this German patent of 45,457, 1887, more fully and with greater variety in the choice of materials. There are some directions in the patent in suit which are not contained in this German patent.

"1. The German patent makes no reference whatever to the use of organic acids, such as citric or tartaric, or hydrates of carbon such as sugar, grape sugar or glucose, to prevent the precipitation of basic salts, as the patent in suit does.

"2. The German patent does not recommend the use of a salt of mercury to improve the character of the deposit as the patent in suit does.

"3. The German patent does not recommend the addition to the bath of an alkaline salt to improve the electrolytic conductivity."

The recommendation in the patent in suit of the use of a salt of mercury, to improve the character of the deposit, and the recommendation of an addition to the bath of an alkaline salt, to improve the electrolytic conductivity, clearly indicate merely permissible, and not es-

sential, ingredients of the bath of the patent in suit. The use of organic acids, to prevent precipitation of basic salts, as pointed out by Dr. Chandler, was old in the art. Their use is distinctly provided for in the German patent, 49,826, dated December 29, 1888, granted to Skagg and Falk, and in the Austrian patent of October 4, 1890, two of the patents recited in the specification of the original of the patent in suit. Also in the Jacoby and Klein (U. S.) patent of 1868, we find a weak organic acid is added to the bath, in order to prevent the precipitation of the salts of peroxide of iron.

Complainants, however, contend that these German, Austrian and Hungarian patents do not anticipate the patent in suit, because no mention is made therein of a mineral acid in the original aqueous solution of the aluminium salt in which the coating metal is dissolved; in other words, that none of them employs commercial aluminium sulphate containing free acid. The complainants' expert insists that this is the important difference between the patents referred to and the patent in suit. He says:

"The whole intention of the patent in suit is to provide a strongly metallic bath that will give a practicable coating. The baths heretofore invented including this bath of Falk, were all defective in this respect. They were not sufficiently charged with excess of metal in solution. The bath in Alexander's patent is made to contain more metal in solution by the simultaneous use of hydrochloric or sulphuric acid along with the chloride or sulphate of aluminium at the time the reguline metal is dissolved in the bath. The patentee distinctly states that he does not employ chemically pure chloride of aluminium, but such as contains some free acid. When metallic zinc is soaked in a solution of chemically pure sulphate or chloride of aluminium, a certain portion of this metallic zinc is dissolved and appears to go into solution without chemical change, just as salt dissolves in water. When, however, a small amount of sulphuric acid is added to the sulphate of aluminium solution, a much larger amount of zinc goes into solution. The increased amount which thus goes into solution is very much more than can be accounted for by the ordinary chemical action of the free sulphuric acid on the zinc plate.' This is a somewhat obscure phenomenon, but it is not at all unknown and has many counterparts in other chemical reactions of familiar occurrence."

But the reason given by the expert for the use of the chloride of aluminium, of some free acid, is not the reason given by the specifications of the patent in suit. In the third bath described in the specifications of the patent in suit (the one with which we are here concerned), the patentee says:

"In speaking of chloride of aluminium, I mean such chloride of aluminium as can be procured in the market at a reasonable price. This chloride of aluminium is not chemically pure, always containing some free acid, and the reguline metal is added to the bath in order to combine (neutralize) this free acid. Chemically pure chlorides of aluminium are so expensive that their use in this process would be impracticable for that reason."

The clearly expressed reason, therefore, for the presence of some free acid in the chloride of aluminium, is that, for practical use, commercial chloride of aluminium must be resorted to, containing some free acid, and this free acid is a thing to be gotten rid of or neutralized as stated in the specifications. It is absurd, therefore, as pointed out by the defendant's expert, to insist upon the unavoidable presence of some free acid in commercial aluminium salts, a presence to be gotten rid of by a special means suggested in the specification, **as a substantial differentiation from the prior German Patents. No**

other essential or important difference is pointed out by complainants' expert. Dr. Chandler thus testifies:

"The witness Horne, in his answer to Q. 16, lays great stress on the presence of free acid in the commercial ·chloride of aluminium employed in the patent in suit. He regards it of the utmost importance, and points it out as constituting a most important difference and distinction between the patent in suit and the prior patent of Falk taken out in Germany in 1887, No. 47,457, which is substantially identical with the Austrian patent of Falk. These two patents of Falk distinctly specify the use of basic salts, just as does the patent in suit. They both employ chloride of aluminium as the raw material of the production of the baths. They both provide for saturating a boiling solution of chloride of aluminium with either metallic zinc or metallic aluminium. The patent in suit calls for the use of commercial chloride of aluminium. The two patents of Falk, German and Austrian, call for the use of chloride of aluminium, the word 'commercial' being omitted. Mr. Horne's contention is that this difference is of the utmost importance, that it differentiates the patent in suit from the prior patents of Falk, notwithstanding the fact that both patents are for the use of baths for depositing zinc electrically, which contain basic salts of aluminium and zinc and he bases this alleged important distinction on the alleged fact that commercial chloride of aluminium contains a considerable, i. e. an important amount of free acid, and that this free acid plays a very important part in the process of the patent in suit, and further, that because Falk doesn't specify commercial chloride of aluminium, that he must employ chemically pure chloride of aluminium, which does not contain any free acid. There is absolutely no foundation for this distinction. There is no reason why Falk should say and emphasize commercial chloride of aluminium; commercial chemicals are what the manufacturer always purchases. After forty years of experience in studying patents and commercial processes, I am prepared to state that when a patent calls for the use of a chemical, it necessarily means the commercial article, unless for some special reason, which must be specified, the commercial article is not suitable for the purpose, and an article of some special, unusual quality, must be provided, and it must be specified in the patent; otherwise the patent will be void, because an important item in the process had been suppressed, so that persons skilled in the art would not be taught how to practice the process by the specification. If, therefore, it is true that the commercial chloride of aluminium contained a substantial amount of free acid, then there must have been just as much free acid employed in the baths of Falk as in the baths of the patent in suit, as they are both made by dissolving commercial chloride of aluminium, and the subsequent treatment with metallic zinc, or metallic aluminium, is identical in both. * * *

"I would say further, if commercial chloride of aluminium is employed in carrying out the process of this patent, which contains free acid, it will simply be neutralized by the metallic aluminium and add slightly to the amount of aluminium chlorides in the liquid, or it will be neutralized by zinc and add a small amount of chloride of zinc to the bath. After the free acid is neutralized and the boiling is continued as directed by the specification, the real process of the patent begins. The aluminium or the zinc is converted by solution into chloride, which becomes basic, and the chloride of aluminium or chloride of zinc already present also becomes basic. Now this process, which is the characteristic part of the process of the patent, would take place quicker if there were no free acid in the original chloride of aluminium, and would take place just as effectively and completely as if there had been no free acid in the original chloride of aluminium. It absolutely makes no difference whatever to the character of the bath produced by the patent in suit, whether the chloride of aluminium contains free acid or not."

Giving due weight to this scientific and expert testimony, we cannot avoid a conclusion that, by its preponderance, it establishes a clear anticipation of the patent in suit.

The decree of the court below is therefore affirmed, on the ground of the invalidity of the patent.